UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| AMANDA N. SCHEVE, | ) |
| Plaintiff, | ) ) ) ) |
| vs. | ) Case No. 4:20-CV-01038-SEP ) |
| KILOLO KIJAKAZI,[1] | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) for judicial review of the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of Social Security, denying the application of Plaintiff Amanda N. Scheve for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*. An Administrative Law Judge (ALJ) evaluated her case and found that Plaintiff was disabled for a closed period that ended on March 9, 2017, but that her condition improved after that date, at which time she was no longer disabled under the Act. Because substantial evidence does not support the decision denying benefits after the closed period, the Court will reverse the decision and remand for further review.

**I.   BACKGROUND**

On March 2, 2015, Plaintiff applied for DIB and SSI, alleging that she had been unable to work due to disability since May 31, 2012. (Tr. 15, 84, 104, 178, 197). In her application, she alleged disability due to depression, anxiety, narcolepsy, post-traumatic stress disorder related to rape, mood disorder with history of self-harm, and borderline personality disorder. (Tr. 84). Plaintiff was initially denied on August 19, 2015, and she filed a Request for Hearing by Administrative Law Judge (ALJ) on August 24, 2015. (Tr. 104-05, 115-17). After a hearing, in

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted as the Defendant in this case. No further action is needed for this action to continue. *See* 42 U.S.C. § 405(g) (last sentence).

a decision dated October 3, 2017, the ALJ found Plaintiff not disabled. The ALJ's decision was based in part on Plaintiff's poor compliance with her prescribed medication regimen. (Tr. 12-35). After the Appeals Council denied Plaintiff's request for review, she appealed the decision in a civil action in federal district court. (Tr. 593-603). On August 29, 2019, in a decision by the Honorable Noelle C. Collins of the Eastern District of Missouri, the Court reversed and remanded the ALJ's decision. (Tr. 604-614). Judge Collins found that the ALJ had not adequately considered whether Plaintiff's noncompliance with her prescription medication was attributable to her mental health impairments and remanded her claim for further review. *Id*.

Upon remand, the same ALJ conducted an updated hearing on November 23, 2020. (Tr. 526-49, 561-92). Plaintiff, who was represented by counsel at both of her hearings, testified that she lived with her mother and her daughter, who was seven years old at the time of the second hearing. (Tr. 565). She testified that she had been under the care of psychiatrists since she was thirteen years old for anxiety and depression. (Tr. 40-41). She further testified that she was raped in 2011, and the trauma of that event led to a diagnosis of PTSD and borderline personality disorder, which reduced her functionality to the point that she became disabled. *Id*. Plaintiff also provided a written statement in which she indicated that she had been a virgin when she was raped, and that she became pregnant as a result of the incident. (Tr. 342). She stated that the rape changed her life dramatically, causing her depression, anxiety, and PTSD to become much worse. *Id*. She stated that she has periods of depression, crying spells, panic attacks, and difficulty concentrating and remembering. (Tr. 55-56, 566).

She testified that her daughter was homeschooled, and her mother does most of the homeschooling, while Plaintiff sometimes helps. (Tr. 573). She testified that while she can drive, her mother usually drives her places, as the sleepiness from her narcolepsy makes it difficult to stay alert. (Tr. 565, 571). She testified that, due to her poor memory and concentration, her mother helps her with most of the household chores, either by performing them herself or reminding Plaintiff of things that need to be done. (Tr. 582-84). She testified that her mother also helps Plaintiff with money management and bills, and with keeping track of medications and appointments. (Tr. 59-60, 583-84). Plaintiff further testified that she also has a case manager assigned to her through her psychotherapy provider, whose role is to help her manage medications and appointments, accompany her to medical appointments, and help Plaintiff find resources to manage various difficulties as they arise. (Tr. 584-85).

2

She also testified that she works part-time at the Disney Store at the Galleria Mall, usually working approximately four to five hours a day on two to three days per week. (Tr. 49-50, 571). She testified that if she works more than that, she becomes extremely fatigued and experiences panic attacks and other negative symptoms. (Tr. 50). She testified that her supervisors at the Disney Story are "extremely intuitive" of and accommodating to her needs, and they allow her to take at least two additional breaks during her shift in addition to the regular 15-minute break to which she is entitled. (Tr. 50, 578-79. She further testified that they encourage her to take a break or go home if she exhibits signs of fatigue or panic attacks. (Tr. 578-9). Plaintiff provided a written statement about her work as well, in which she indicates that her managers at the store always "make sure to work around [her] doctor appointments and even [her] needed naps," and have found ways to help her be a good employee. (Tr. 341).

In a partially favorable decision issued on May 14, 2020, the ALJ found Plaintiff was disabled as defined in the Act from May 31, 2012, through March 8, 2017, but that her disability ended on March 9, 2017, due to medical improvement. (Tr. 526-49). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's (SSA) Appeals Council (Tr. 161), and the Appeals Council denied her Request for Review. (Tr. 1-4). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Acting Commissioner of the Social Security Administration.

As to other evidence from Plaintiff's medical records, the Court accepts the facts as provided by the parties. The Court will address specific facts related to the issues raised by the parties as needed in the discussion below.

## II.   STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial

3

gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a);[2] *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" (RFC), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if he cannot make such an adjustment, he will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

---

[2] All references throughout this opinion are to the version of the regulations that was in effect as of the date of the ALJ's decision.

4

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

In cases where an ALJ considers whether a claimant was disabled for only a closed period of time, there is an additional analysis that must be performed to determine whether the claimant's disability has ceased. That analysis may involve up to the following eight steps:

> (1) whether the claimant is currently engaging in substantial gainful activity; (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment; (3) whether there has been a medical improvement; (4) if there has been medical improvement, whether it is related to the claimant's ability to work; (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies; (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe; (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity; and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

*Koch v. Kijakazi*, 4 F.4th 656, 661–62 (8th Cir. 2021) (citing *Dixon v. Barnhart*, 324 F.3d 997, 1000–01 (8th Cir. 2003).

### III.   THE ALJ'S DECISION

Applying the foregoing five-step analysis to determine whether Plaintiff was disabled at any time, the ALJ here found that Plaintiff has not engaged in substantial gainful activity since the alleged onset date, May 31, 2012; that Plaintiff has the severe impairments of bipolar disorder, anxiety disorder, a personality disorder, a trauma or stressor-related disorder, narcolepsy, restless leg syndrome, and obesity; and that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 526-49).

The ALJ found that from May 31, 2012, through March 8, 2017, Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b), except that she could not climb ladders, ropes, or scaffolds or work at unprotected heights or around unprotected, dangerous machinery; could not work alone around open flames or open bodies of water, or at jobs that

5

require operation of a motor vehicle; she was limited to simple and/or repetitive work that did not require close interaction with the public, and was limited to jobs that had only occasional changes in work routine and work settings, and that allowed for some variation of effort throughout the workday, as long as end-of-workday goals were attained. (Tr. 531). However, the ALJ also found that, "[d]ue to the combination of her mental health impairments, prior to March 9, 2017, [she] would have reasonably been absent from work two days per month," thus precluding substantial gainful employment. (Tr. 531). Accordingly, the ALJ determined that Plaintiff was disabled as defined in the Act from May 31, 2012, through March 8, 2017. (Tr. 536).

      The ALJ then went on to perform the eight-step analysis required to determine whether Plaintiff's disability had ceased. (Tr. 538-48). The ALJ determined that Plaintiff had the same severe impairments on and after March 9, 2017, as she had before that date, and that those impairments still did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. He further found that her disability ended on March 9, 2017, due to medical improvement, and that such medical improvement was related to Plaintiff's ability to work. He found that Plaintiff's "prescribed medications, her general course of treatment, and her daily activities after March 8, 2017, are not reasonably consistent with a finding of disability." (Tr. 540). More specifically, the ALJ determined that as of that date, Plaintiff achieved good compliance with her medication regimen, and experienced a concomitant improvement in her mental health symptoms. The ALJ reasoned that due to such improvement, the evidence did not support a finding that, as of March 9, 2017, she would miss any workdays in a normal month. Therefore, the ALJ went on to find that Plaintiff had the same RFC as described above, with one significant difference—the post-March 2017 RFC omits the sentence stating that Plaintiff was reasonably expected to miss two or more days of work per month.

      The ALJ proceeded to find that Plaintiff had no past relevant work. (Tr. 548). But considering Plaintiff's age, education, and work experience, and in reliance on the testimony of a vocational expert (VE), the ALJ found that as of March 9, 2017, Plaintiff would be able to perform other occupations including housekeeper (Dictionary of Occupational Titles (DOT) No. 323.687-014, light exertion level, 220,000 jobs in the national economy), small product assembler (DOT No. 739.687-030, light exertion level, 200,000 jobs in the national economy),

6

and price marker (DOT No. 209.587-034, light exertion level, 125,000 jobs in the national economy). (Tr. 548-49).

## IV. STANDARD FOR JUDICIAL REVIEW

This Court must affirm the Commissioner's decision if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Pate-Fires*, 564 F.3d at 942. *See also Biestek*, 139 S. Ct. at 1154 ("Substantial evidence . . . means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Consolidated Edison*, 305 U.S. at 229).

In determining whether substantial evidence supports the Commissioner's decision, the Court considers both evidence that supports that decision and evidence that detracts from that decision. *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012). However, the Court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## V. DISCUSSION

Plaintiff argues that the ALJ's RFC determination as of March 9, 2017, is not supported by substantial evidence on the record as a whole, because once Plaintiff met her burden of demonstrating that she was disabled, the burden then shifted to the Commissioner to demonstrate that Plaintiff experienced medical improvement that restored her ability to perform sustained

work, and the Commissioner did not meet this burden.  For the reasons stated below, the Court agrees, and will reverse and remand.

Although the claimant bears the initial burden to demonstrate that she is disabled, because Plaintiff met that burden, the burden shifted to the Commissioner to show that she is no longer disabled based on medical improvement related to her ability to work.  *See Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) (citing *Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991) (per curiam) ("If the Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work.")).

Once an ALJ has found that a claimant is, or has been, disabled, he may then determine whether that disability has ceased by applying the medical improvement standard.  *Delph v. Astrue*, 538 F.3d 940, 945 (8th Cir. 2008).  Medical improvement "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with" the claimant's impairments "measured from the most recent favorable decision that the claimant was disabled." *Id.* at 946–47 (quotations omitted).  The issue under this standard "is whether the claimant's medical impairments have improved to the point where [s]he is able to perform substantial gainful activity." *Id.* at 945 (citing 42 U.S.C. § 423(f)(1)).  It "requires the Commissioner to compare a claimant's *current* condition with the condition existing *at the time the claimant was found disabled* and awarded benefits."  *Id.* (emphasis added).

Here, the ALJ determined that as of March 9, 2017, Plaintiff achieved good compliance with her medication regimen, with a corresponding improvement in her mental health symptoms. The ALJ went on to conclude that Plaintiff's "prescribed medications, her general course of treatment, and her daily activities after March 8, 2017, are not reasonably consistent with a finding of disability."  (Tr. 540).

**A. Substantial Evidence Does Not Support Medical Improvement**

As described above, when determining whether a claimant is no longer disabled due to medical improvement, the heart of the analysis entails comparing her current condition with her condition as it existed during the time she was found disabled.  Here, the ALJ determined that Plaintiff was disabled prior to March 9, 2017, based largely on two factors.  First, he noted that Plaintiff's compliance with her prescribed medication regimen was erratic, which contributed to

8

increased mental health symptoms, including mood instability. (Tr. 532-33). Additionally, he stated that his determination was "[b]ased in part on the significant indication in the record that the claimant was dependent on her mother during appointments with Dr. Coons [her psychiatrist] and in performing her activities of daily living." (Tr. 533). Because of this, he went on to find that Plaintiff "would reasonably miss two workdays each month—at least until the beginning of 2017—due to her mental health impairments, including her personality disorder with dependent traits." *Id*.

The ALJ went on to find, however, that Plaintiff's "prescribed medications, her general course of treatment, and her daily activities after March 8, 2017, are not reasonably consistent with a finding of disability." (Tr. 540). As to what changed with respect to Plaintiff's circumstances on that date, the ALJ explained that Plaintiff had "been mostly compliant with her medications as of and after March of 2017," because "as of March 8, 2017, she started having her medications delivered." *Id*. The ALJ explained that the evidence of record after that date "demonstrates that [her] compliance with taking her medications was much improved, and that her abilities to perform daily activities and to sustain work-related functions accordingly improved as well." *Id*. However, as further discussed below, a review of the record reveals that Plaintiff's medication compliance, her symptoms, her treatment, and her daily activities are largely the same both during and after the closed period of disability.

The Court first considers Plaintiff's compliance with her medication regimen. There is no doubt that the record indicates at best sporadic compliance with Plaintiff's medication regimen prior to March 8, 2017. However, the record after March 8, 2017, is likewise replete with evidence that Plaintiff remained frequently noncompliant with her drug regimen. For example, on April 29, 2017, almost two months after she started having her medication delivered to her home, Plaintiff told the doctor that her personal goal was to start taking her medication as prescribed by June 2017. (Tr. 758). The office notes from this visit indicate that the doctor expects that Plaintiff's mother would need to "encourage" and "remind[ ]" her to take her medication, and that her mother should accompany Plaintiff to her appointments to provide support. *Id*. At a follow-up appointment on May 5, 2017, Plaintiff admitted that she had not been consistently taking her medications. (Tr. 760). At an appointment on August 28, 2017, Plaintiff again set a personal goal to become compliant with her medicine regimen, this time aiming to be compliant by October 2017. (Tr. 777). The record contains multiple further

9

indications that she continued to have difficulties with medication compliance over the next few years.  On October 1, 2018, she told her doctor that she would try to be "better" about her medication, and set yet another personal goal, hoping to be compliant with taking her medication as prescribed by January 2019.  (Tr. 846).  Then, in January 2019, Plaintiff set another personal goal, this time indicating that she wanted to better manage her symptoms by taking her medication as prescribed by April 2019.  At a doctor's appointment on May 24, 2019, Plaintiff admitted that her compliance with taking her Prozac had been "sporadic."  (Tr. 935).  Finally, at an appointment on August 14, 2019, Plaintiff reported that she had been "off her meds for several months," and that coping with her symptoms had been much more difficult.  (Tr. 940).

With respect to Plaintiff's symptoms and treatment, her objective mental status examinations before and after March 8, 2017, were substantially the same.  Throughout both periods, she was noted to have limited insight and judgment, only fair attention and concentration, and mood and affect that ranged from euthymic to depressed, anxious, tearful, and mildly labile.  (Tr. 407-08, 413-14, 416-17, 419-20, 433-34, 731-32, 760-61, 767, 770-71, 779-80, 786, 795, 809, 816, 819, 823-24, 826, 829-31, 857, 907, 911-15, 923, 925, 936, 945, 950).  Additionally, her treatment was if anything more intensive after March 8, 2017.  The only change in her medication after the closed period was an increase in dosage.  On December 6, 2017, her psychiatrist decided to increase her dosage of Prozac because of her "severe mood instability and frequent crying, sadness, and anger."  (Tr. 799).  Additionally, during 2017 and 2018, she was assigned a new case manager, began seeing a new therapist at the YWCA Women's Resource Center, and started a new treatment therapy, Eye Movement Desensitization and Reprocessing.  (Tr. 838, 921-23).  This all would seem to indicate that her symptoms did not decrease in intensity, and persisted well after the closed period.  *See* SSR 16-3p ("[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments . . . or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.").

As for Plaintiff's daily activities, they too were generally the same both prior to and after March 8, 2017.  Prior to that date, she worked part-time at the Disney Store (and became stressed and symptomatic when she tried to work longer hours), helped her mother homeschool her daughter, and relied on her mother and case manager to help her make and keep appointments

10

and consistently take her medication.  After that date, she continued to work at the same part-time job for the same limited number of hours, helped her mother homeschool her daughter, and relied on her mother and case manager to help her make and keep appointments and consistently take her medication.  (Tr. 849, 921-23, 933).

In sum, the record indicates that Plaintiff's noncompliance with her medication regimen, her dependence on her mother, her symptoms, her treatment, and her activities of daily living were largely the same both before and after March 9, 2017.  Consequently, the Court finds that substantial evidence does not support a conclusion that her disability had ceased on that date due to medical improvements "to the point where [s]he [was] able to perform substantial gainful activity."  *Delph*, 538 F.3d at 945.

## VI.    CONCLUSION

Having reviewed the entire record, the Court finds that the final decision of the Commissioner is not supported by substantial evidence.  The case will be remanded to the Commissioner for a new medical-improvement evaluation.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner of Social Security is **REVERSED**, and this case is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

Dated this 11th day of March, 2022.

                                                                           _____
                                                                           SARAH E. PITLYK
                                                                           UNITED STATES DISTRICT JUDGE

.